UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WALTER HARRIS, | : | No. 1:22-CV-1512 |
| | : | |
| Plaintiff | : | (Munley, J.) |
| | : | |
| v. | : | (Caraballo, M.J.) |
| | : | |
| LT. BISCOE, et al., | : | |
| | : | |
| Defendants | : | |

## REPORT & RECOMMENDATION

### I.   Introduction

On July 29, 2022, plaintiff Walter Harris initiated this civil rights action against 12 Pennsylvania Department of Corrections ("DOC") employees affiliated with State Correctional Institution Mahanoy ("SCI Mahanoy"). Doc. 1-4. Before the Court are Harris's Eighth Amendment failure to protect claims against remaining defendants Lt. Biscoe, Michael Dunkle, Wesley Matrey, Theresa Delbalso, and Dawn Santana, premised on allegations that they knowingly failed to protect him against a serious risk of harm. Doc. 1-4 at 9–11. On May 23, 2024, the defendants moved for summary judgement against Harris, seeking dismissal of all remaining claims. Doc. 54. The motion was fully briefed,

is ripe for decision, and was referred to the undersigned to issue a report and recommendation.

As set forth below, Harris failed to exhaust administrative remedies for his Eighth Amendment failure to protect claims against Delbalso, Dunkle, and Matrey before filing this suit, as required under the Prison Litigation Reform Act ("PLRA"). Moreover, his remaining claims against Santana and Biscoe are substantively flawed, for want of personal involvement in the alleged wrongs, and the absence of deliberate indifference. Accordingly, the undersigned recommends granting the defendants' motion for summary judgment and dismissing all remaining claims and defendants with prejudice.

## II.   <u>Background</u>

### A. Relevant Procedural History

Harris is a state inmate who, during the relevant period, was confined at SCI Mahanoy. Doc. 55-4 at 6–7. The facts underlying this action pertain to an event that occurred at SCI Mahanoy in 2020, where Harris was attacked by another inmate, Laquan Harris-Bracey, after being placed in a cell together. Doc. 1-4 at 9. According to Harris, the

assault resulted from prison staff disclosing his status as an informant during misconduct proceedings. *Id.*

Harris brought a complaint on July 29, 2022, against 12 SCI Mahanoy personnel, advancing claims of failure to protect under the Fourth, Eighth, and Fourteenth Amendments (Count I), negligence (Count II), and *Monell* liability (Count III). Doc. 1-4. Although Harris initially filed suit in the Philadelphia County Court of Common Pleas, it was removed to the United States District Court for the Eastern District of Pennsylvania on August 19, 2022. Doc. 1.

On September 23, 2022, Harris voluntarily dismissed defendant Brian Shiptoski, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). Doc. 14. Through stipulation of the parties, the suit was transferred to this district on September 28, 2022. Docs. 16, 17, 18. On November 16, 2022, and prior to the defendants serving an answer or moving for summary judgment, Harris unilaterally withdrew the *Monell* liability claim at Count III, pursuant to Rule 41(a)(1)(A)(i). Doc. 28. The defendants answered Harris's complaint on April 21, 2023, and discovery closed on March 12, 2024. Docs. 34, 50.

On May 23, 2024, the defendants moved for summary judgment, seeking dismissal of all claims. Doc. 54. In their motion, the defendants contend that Harris failed to exhaust his administrative remedies before bringing this suit, as required under the PLRA. Doc. 56 at 5–8. They also argue that Harris failed to establish the defendants' personal involvement in the underlying facts for purposes of a Section 1983 claim and, alternatively, that Harris cannot meet one or more of the elements of his failure to protect claim under the undisputed facts. *Id.* at 8–15. Finally, the defendants contend that Harris's negligence claim fails, because they are shielded by sovereign immunity under the Eleventh Amendment. *Id.* at 25–28.

Harris filed a timely opposition and statement of facts on July 17, 2023. Doc. 61. In opposition to the defendants' request for summary judgment on the failure to protect claim, Harris counters that record evidence demonstrates administrative exhaustion. *Id.* at 13. He also avers that the evidence in the record supporting his claim warrants surviving summary judgment. *Id.* at 5–13.

In his brief, Harris also seeks to withdraw his negligence claim at Count II, and to withdraw all claims against six of the remaining

4

defendants: C.O. Rivello, Bernadette Mason, Jennifer Mahally, Lori White, Laura Banta, and Charles Stetler. Doc. 61 at 13.[1] As Harris did not file a stipulation of dismissal for those claims and defendants, as required by Rule 41(a)(1)(A)(ii), the premise for the request remains unclear. Accordingly, the undersigned construes the requested withdrawal as a non-opposition to defendants' motion for summary judgment, and recommends dismissal of Count II and defendants Rivello, Mason, Mahally, White, Banta, and Stetler, with prejudice. Thus, remaining before the Court is Harris's Eighth Amendment failure to protect claim (Count I) against defendants Biscoe, Dunkle, Matrey, Delbalso, and Santana. *See* Doc. 61 at 13–14.[2]

In his complaint, Harris alleged that he suffered injuries from Harris-Bracey during the underlying attack, and that prior to the attack, he "requested to stay in a cell by himself," because there were

---

[1] Harris also seeks to withdraw all claims against Shiptoski who, as noted above, was voluntarily dismissed from this action shortly after it was removed from county court. Doc. 14.

[2] The defendants aver that the failure to protect claim has no basis in the Fourth Amendment, and that the Fourteenth Amendment is simply a vehicle for Harris to assert his Eight Amendment claim. Doc. 56 at 10 n.1. Harris does not dispute that characterization, and styles his claim as one falling under the Eighth Amendment in his opposition. *See* Doc. 61 at 5. Accordingly, the undersigned addresses the remaining claim only through the lens of the Eighth Amendment.

5

"rumors within the prison" he was a snitch, which left him in fear for his safety. Doc. 1-4 at 9. Harris seeks to hold SCI Mahanoy corrections officers Biscoe, Dunkle, and Matrey liable for the attack, alleging that they "were responsible for [his] placement in Harris-Bracey's cell[,]" and that they "knew or should have known [he] would not be safe with Harris-Bracey." *Id*. Similarly, Harris seeks to hold SCI Mahanoy facilities manager Delbalso liable for the attack, alleging that she "knew or should have known that [he] was at risk for being attacked and/or that inmate Harris-Bracey was dangerous," and that it was her responsibility to "have done something about it." *Id*. at 10. Harris separately seeks to hold SCI Mahanoy hearing officer Santana liable for the attack, based on her alleged review of a grievance arising out of the assault. Specifically, the complaint alleges that Harris "filed a grievance regarding his egregious treatment[,]" that Santana reviewed it, but that "nothing was done." *Id*.

### B. Factual Background

The parties do not dispute many of the facts relevant to this lawsuit, and the record is well developed. The physical assault giving rise to this action transpired on February 24, 2020, while Harris was

incarcerated in SCI Mahanoy's restricted housing unit. Doc. 55 at 1–2; Doc. 61-2 at 1. That day, Harris was handcuffed in the front and escorted by non-party corrections officers to a cell containing another inmate, Harris-Bracey. Doc. 55-3 at 9–17; Doc. 55 at 2; Doc. 61-2 at 1; Doc. 61 at 6. Upon Harris's entry into the cell and the securing of the door, and while Harris was still handcuffed, Harris-Bracey approached him from the front and struck him in the face and head area with a closed fist. Doc. 55-3 at 9–17; Doc. 55 at 2; Doc. 61-2 at 1. The attending officers ordered Harris-Bracey to stop, and when he failed to comply, they fired OC spray into the cell. Doc. 55-3 at 7, 9, 11, 13, 15. The cell door was then opened, Harris and Harris-Bracey were separated, and both were removed from the cell. *Id.*

Harris and Harris-Bracey were later admitted to the medical department for treatment. *Id.* Upon examination, Harris was treated for abrasions on the left side of his head and a laceration on his bottom lip; Harris-Bracey was treated for lacerations on his back caused by an improvised weapon used by Harris. *Id.* at 23, 32–47.

During the period of January through March 2020, which encompasses the events giving rise to this action, Harris filed two

grievances with SCI Mahanoy. As set forth below, Harris pursued both grievances through all three levels of administrative review—initial review, appeal, and final review:

1. On January 3, 2020, Harris filed grievance #843207. Doc. 61-8 at 9. In it, he alleged that prison personnel were deliberately indifferent to his safety when they revealed in a misconduct report pertaining to inmate Shields that information provided by Harris led to Shields being disciplined. *Id.* at 9–10. Harris specifically accused defendant Biscoe and non-party Ellenberger of being the source of the "leaked" information, and Biscoe of prompting a rumor among the prison that Harris was an informant. *Id.* at 10. Harris attached as an exhibit to the grievance a copy of the misconduct report in question. *Id.* at 7. In the misconduct report, the hearing examiner, defendant Santana, described Biscoe's report that Harris admitted to being involved in a prison narcotics scheme with Shields. *Id.* at 7. The grievance was denied at initial review, on the merits, by defendant Dunkle. Harris appealed, claiming that he mistakenly accused Ellenberger, instead of Santana, of being one of the disclosing parties. *Id.* at 4–5. Harris also took exception to the response by the initial reviewer, Dunkle, and accused him of being wrong on key facts, including his finding that prison staff had not acted with deliberate indifference toward Harris's safety. Doc. 61-8 at 4–5. The initial appeal was denied on the merits by defendant Delbalso; the appeal to final review was likewise denied on the merits. *Id.* at 2–3.

2. On February 25, 2020, Harris filed grievance #853530, concerning the February 24, 2020, assault by Harris-Bracey. Doc. 55-9 at 8. In the grievance, Harris attributed the assault to two circumstances. First, that prison personnel (none of whom are defendants here) failed to follow procedure when they left Harris-Bracey unsecured in his cell while Harris was placed inside. *Id.* at 8–9. Second, the circumstances alleged in grievance #843207, in which Harris's alleged status as an

informant was revealed during misconduct proceedings. *Id*. Harris noted that he "wrote" to defendants Matrey and Biscoe before submitting the grievance. *Id*. at 8. On initial review, Matrey denied the grievance on the merits, noting that staff never referred to Harris as a "snitch," and that he requested to be moved to Harris-Bracey's cell. *Id*. at 7. In his initial appeal, Harris contended that Matrey was mistaken on key facts, including on his claim that Harris requested to be housed in the same cell as Harris-Bracey. *Id*. at 4–5. This appeal, and Harris's subsequent appeal to final review, were both denied on the merits. *Id*. at 2–3.

Thus, both grievances that Harris filed and later appealed during the period at issue were related to his federal action and ultimately denied on the merits at the final level of administrative review.

## III.  Discussion

### A. Motion for Summary Judgment Standard

Summary judgment is appropriate only when record materials, including but not limited to, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007); Fed. R. Civ. P. 56(a), (c)(1)(A). In determining whether a genuine issue of material fact exists, the court must view the evidence "in the light most favorable to the non-

moving party and must make all reasonable inferences in that party's favor." *Wishkin*, 476 F.3d at 184.

A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material only if it "might affect the outcome of the suit under the governing law . . . ." *Id.* But "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including but not limited to] the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* " '[T]he non-moving party must [then] oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare

10

assertions, conclusory allegations, or suspicions will not suffice.' "
*Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018)
(quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir.
2014)).

Even where, as here, the movant argues that the non-movant has
failed to produce sufficient evidence to prevail on a claim at trial, the
movant must still satisfy the initial burden of informing the court of the
basis for its motion. *Celotex Corp.*, 477 U.S. at 323 ("[A] party seeking
summary judgment always bears the initial responsibility of informing
the district court of the basis for its motion[.]"). This means that
"[w]here the moving party does not have the burden of proof on the
relevant issues," and they have pinpointed in their motion "deficiencies
in the opponent's evidence" sufficient to show no reasonable jury could
return a verdict for the non-movant, they are entitled to "judgment as a
matter of law." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922
F.2d 168, 175 (3d Cir. 1990).

## B. Failure to Exhaust Under the PLRA

The defendants contend that Harris failed to exhaust his
administrative remedies before filing this lawsuit, thus warranting

dismissal of all defendants. Specifically, they aver that Harris did not name any of the remaining defendants in grievance #853530, which concerned the Harris-Bracey assault, beyond claiming that he "wrote" to Matrey and Biscoe. Doc. 56 at 7–8. Thus, the DOC was not put on notice through the grievance process of the claims Harris now brings in this federal action. *Id.* Harris, in opposition, highlights the instances in which both grievances #853530 and #843207 reference Biscoe, Dunkle, Matrey, and Santana; Delbalso goes unmentioned. Doc. 61 at 13. Harris alternatively requests an exhaustion hearing if the Court finds his grievances insufficient. *Id.*

A review of grievances #853530 and #843207 finds that they did not put the DOC on notice of the claims Harris now brings against defendants Delbalso, Dunkle, and Matrey, which therefore should be dismissed with prejudice. The grievances did, however, sufficiently notify the DOC of the claims now asserted in this federal action against defendants Biscoe and Santana, thus warranting further analysis.

The PLRA provides that before prisoners file suit in federal court over the conditions of their confinement, they must have first exhausted all "administrative remedies as are available[.]" 42 U.S.C. § 1997e(a).

12

This legislation was intended to "eliminate[] courts' conducting case-by-case inquiries until after a prisoner has presented his [current] claims to a particular administrative remedy program, which often helps focus and clarify the issues for the court." *Nyhuis v. Reno*, 204 F.3d 65, 74 (3d Cir. 2000) (quoting *Alexander v. Hawk*, 159 F.3d 1321, 1326 n.11 (11th Cir. 1998)).

Thus, "just as subject-matter jurisdiction, personal jurisdiction, and venue, exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time." *Small v. Camden Cnty.*, 728 F.3d 265, 269–70 (3d Cir. 2013). Because administrative exhaustion is a threshold issue, "factual disputes relevant to exhaustion" may usually be resolved by a district judge without the participation of a jury, provided that the parties receive "some form of notice . . . and an opportunity to respond[.]" *Prater v. Dep't of Corr.*, 76 F.4th 184, 265 (3d Cir. 2023); *but see Perttu v. Richards*, 605 U.S. 460, 468 (2025) (holding that "as a matter of statutory interpretation that parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim . . . ."). Although exhaustion under the PLRA is a threshold issue,

it nevertheless is an affirmative defense that the defendant must themselves assert. *Jones v. Bock*, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA[.]").

Exhaustion under the PLRA must be "proper" to be effective. *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). Proper exhaustion requires full compliance "with the prison's administrative regulations governing inmate grievances." *Prater*, 76 F.4th at 203. In practice, this means the inmate cannot have "further avenues of relief . . . available to him within the . . . grievance process[,]" and his grievance cannot have been denied by the prison for procedural deficiencies. *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004).

Accordingly, a prison's specific grievance procedures "supply the yardstick for measuring" whether a claim has been properly exhausted. *Id.* at 231. The Pennsylvania Inmate Grievance System Policy has been in force at all DOC facilities, including SCI Mahanoy, since 2015. *See*

DC-ADM 804 at 1[3] ("This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections[.]").

The policy, formally known as DC-ADM 804, provides a three-tiered system of review for inmate grievances. *Id.* at 4–25. The first tier is the initial review stage (*id.* at 9); the second tier is the appeal stage (*id.* at 15); and the third tier is the final review stage (*id.* at 18). The DOC also has form-based procedural requirements for grievances, including that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim," including "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that "[a]ny grievance based on separate events must be presented separately, unless it is necessary to combine the issues to support the claim." DC-ADM 804 at 5–6.

Thus, for a grievance to be properly exhausted, it must be grieved through all three tiers of review and comport with applicable procedural

---

[3] Located at https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf.

requirements. *See Woodford*, 548 U.S. at 90–91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."); *Rinaldi v. United States,* 904 F.3d 257, 271 (3d Cir. 2018) ("[W]hen an inmate's allegations have been fully examined on the merits and at the highest level, they are, in fact, exhausted.") (quotations omitted).

The first of Harris's two relevant, fully exhausted grievances, #843207, involved allegations that prison staff were deliberately indifferent to his safety when they disclosed in a misconduct report that Harris provided information leading to another inmate being disciplined. Doc. 61-8 at 9–10. Harris specifically identified Biscoe as the responsible party, and as the source of rumors in SCI Mahanoy that Harris was an informant. *Id.* Harris initially identified non-party Ellenberger as a second culpable party, subsequently clarifying on appeal that Santana, not Ellenberger, should have been named in the grievance. *Id.* at 4–5. Then, in grievance #853530, Harris specifically attributed the assault by Harris-Bracey to the circumstances alleged in

grievance #843207. Doc. 55-9 at 8–9. That sequence of grievances put the DOC on notice, during the administrative process, of the allegations that now form the premise for Harris's federal claims against Biscoe and Santana.

Generally, an inmate's failure to name a defendant in their initial grievance means the inmate's claims against them have not been exhausted. *See Spruill*, 372 F.3d at 234 (explaining that plaintiff's failure to name defendant in initial grievance, despite DC-ADM 804 requiring prisoners to identify "facts relevant to the claim," meant any claim against that defendant was procedurally defaulted unless otherwise excused); *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (concluding prisoner failed to exhaust by not naming defendant in grievance as required by the updated iteration of DC-ADM 804).

But this identification requirement is subject to a caveat. Namely, because "[t]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued[,]" *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)), an inmate's failure to specifically identify a defendant may be excused where the facts of the

17

grievance sufficiently notified the prison of the defendant's involvement. *Travillion v. Wetzel*, 765 F. App'x 785, 789 (3d Cir. 2019) (per curiam). For example, the Court of Appeals determined that when an inmate vaguely claimed in his grievance that "SCI-Rockview staff and/or administration" were responsible for an Eighth Amendment violation, but also "specified the date, location, and relevant facts related to his claim," he sufficiently complied with the identification requirement of DC-ADM 804 against those defendants who fit the functional descriptions he provided in the grievance. *Id.*

Here, Harris advanced grievance #843207 against Biscoe specifically, and a comparison of the allegations finds that they align sufficiently with certain averments in the Complaint. *Compare* Doc. 61-8 at 9–10 ("(Lt. Biscoe) accusing prisoner (Harris #GN-5486) of ratting on inmate-staff report constitutes deliberate indifference[.]") *with* Doc. 1–4 at ¶ 20 ("Plaintiff had previously requested to stay in a cell by himself as there were rumors within the prison that Plaintiff was a 'snitch' (informant). Because of this, Plaintiff feared for his safety.").

Although Harris does not mention Santana by name in the initial grievance, Harris averred that the grievance arose from a misconduct

report written by Santana. Doc. 61-8 at 9–10 ("That a substantial risk
of serious harm exists to me by stating what was said on inmate Shields
. . . disciplinary hearing report"). Moreover, Harris clarified during his
initial appeal that he mistakenly accused Ellenberger, instead of
Santana, of being one of the disclosing parties that prompted rumors of
Harris's status as an informant. *Id*. at 4–5. Thus, the DOC would have
been on notice of both Biscoe's and Santana's alleged involvement for
purposes of exhaustion under the identification requirement of DC-
ADM 804. *Williams v. Beard*, 482 F.3d at 640; *Travillion*, 765 F. App'x
at 789.

The same cannot be said for defendants Dunkle, Delbalso, and
Matrey. Grievance #843207 was denied at initial review, on the merits,
by Dunkle. Doc. 61-8 at 8. In his first appeal of that denial, Harris
contested Dunkle's findings, but the appeal was nonetheless denied by
Delbalso. Doc. 61-8 at 3–5. Neither Dunkle, nor Delbalso, otherwise
make an appearance in the history of grievance #843207, and Matrey is
never referenced in that record.

Despite Harris mentioning Dunkle and Delbalso in his *appeals*, he
failed to name them or Matrey in his initial grievance. *Id*. at 9–10.

Critically, neither Dunkle, Delbalso, nor Matrey were accused of any involvement with the "date, location, and relevant facts," *Travillion*, 765 F. App'x at 789, that concern the underlying misconduct report or rumors of Harris being an informant. *See* Doc. 61-8 at 2–10. Indeed, the only discontent expressed by Harris concerning Dunkle and Delbalso appears to be anchored in their roles in denying his grievance, not prompting it; a factual premise that is wholly distinct from his allegations in the complaint that they were responsible for putting him at risk of the attack by Harris-Bracey. *See* Doc. 1-4 at ¶¶ 24, 28.

Indeed, Harris's disagreement with the denial of his grievance on initial review and appeal could not form a premise for this federal action. As "an inmate has no constitutional right to a grievance procedure," the denial of a grievance is not itself a constitutional violation, and thus cannot give rise to an actionable claim under Section 1983. *Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009). Accordingly, while grievance #843207 supports the exhaustion of those claims Harris brings against Biscoe and Santana, it fails to support those claims he brings against Dunkle, Delbalso, and Matrey. *Woodford*, 548 U.S. at 90–91.

20

The second grievance Harris filed within the operative period, #853530, involved allegations that prison staff's deliberate indifference to his personal safety resulted in the assault by Harris-Bracey on February 24, 2020. Doc. 55-9 at 8–9. Harris protested that staff failed to follow prison procedure when they placed him in the cell with Harris-Bracey while handcuffed, and that his name was "leaked" in the misconduct report he discussed in grievance #843207. *Id*. Critically, none of the defendants are named as the parties responsible for putting Harris in the cell with Harris-Bracey.  Rather, he identifies Corrections Officers Torres and Martin as the SCI Mahanoy personnel who placed him in the cell. Doc. 55-9 at 8.

The only references to any defendants in the history of this grievance are of the procedural variety. Namely, Harris listed Matrey and Biscoe in a section of his initial grievance denoting individuals he "wrote" before filing the grievance. *Id*. at 8–9. And after Matrey denied the grievance, Harris expressed his disagreement on appeal, and refuted Matrey's finding that Harris had requested to move into the cell inhabited by Harris-Bracey. *Id*. at 4–5, 7.

21

Contrary to Harris's position, simply naming Matrey and Biscoe as individuals who he contacted before submitting a grievance, does not suffice the purposes of administrative exhaustion. Doc. 61 at 13. Rather, it highlights the absence of any specific allegation against either defendant in the grievance itself, as Matrey and Biscoe apparently were the individuals that Harris contacted after the fact to protest the actions of other SCI Mahanoy staff. Doc. 55-9 at 8.

Although Harris, on appeal, objected to Matrey's denial of the grievance, that disagreement failed to put the DOC on notice that Harris held Matrey accountable for the underlying grievance itself. Moreover, Matrey's denial of the grievance cannot serve as a basis for this federal action, *Caldwell*, 324 F. App'x at 189, particularly when the federal claims against Matrey are premised on a different set of facts; namely, placing Harris in a cell with Harris-Bracey. And to the extent that, on appeal, Harris raised Matrey's earlier rejection of Harris's request to be housed with a handicapped inmate, Doc. 55-9 at 4–5, that complaint is not related to the "date, location, and relevant facts" of the underlying grievance. *Travillion*, 765 F. App'x at 789. At no point in his grievance history does Harris aver that Matrey was responsible for

placing him in the cell with Harris-Bracey, or involved with disclosing Harris's status as an informant.

Accordingly, Harris failed to exhaust his claims against Dunkle, Delbalso, and Matrey, as required under the PLRA. Summary judgment should be granted in their favor and the claims against them should be dismissed with prejudice. *Small*, 728 F.3d at 269. Harris requests that the Court hold an exhaustion hearing in the event it finds his "grievances in any way deficient." Doc. 61 at 13. That request, however, should be denied, because Harris does not claim, and the record does support any inference, that the grievance process was unavailable to him.

A hearing concerning exhaustion under the PLRA, termed a *Small* hearing, is reserved for situations where the Court must resolve factual disputes not intertwined with the merits of a claim, but that are nonetheless relevant to the question of exhaustion. *Paladino v. Newsome*, 885 F.3d 203, 210–11 (3d Cir. 2018); *Small v. Camden Cnty.*, 728 F.3d 265, 270–71 (3d Cir. 2013); *Perttu*, 605 U.S. at 468. Specifically, *Small* hearings are held where, in the Court's opinion, there is evidence that the plaintiff has not properly exhausted the

23

claims, but also that the defendant may have acted or failed to act such that it rendered grievance remedies "unavailable." *Paladino*, 885 F.3d at 210–11.

In contrast to the common scenarios where *Small* hearings are warranted, no evidence exists in the record here showing that the defendants acted or failed to act such that Harris may have been deprived of access to the grievance process. Indeed, Harris does not argue, nor does the record suggest, that he had any procedural difficulties in administratively grieving his claims. *See* Doc. 61 at 13. To the contrary, Harris's ability to file and fully exhaust grievance #853530 and grievance #843207 evince his wherewithal. Simply requesting an exhaustion hearing in the event of an adverse decision, without offering any disputed facts or basis in the record, does not suffice to create an issue over grievance process availability. *Paladino*, 885 F.3d at 210–11.

## C. The Eighth Amendment Claim

### 1. *Failure to protect claim against Biscoe*

Biscoe seeks summary judgment on the premise that he had no control over or personal involvement with Harris's placement in the cell with Harris-Bracey; a necessary component of a Section 1983 claim.

Doc. 56 at 8–10. In the alternative, Biscoe avers that the evidence of record does not establish his knowledge that Harris-Bracey posed a specific danger to Harris. *Id.* at 12–16. In rebuttal, Harris argues that he has "adduced sufficient evidence to meet his burden in the summary judgment context[,]" and that it is Biscoe's burden to prove he was not aware of "a severe and obvious threat to" Harris's safety. Doc. 61 at 13. As the record shows that no reasonable jury could find that Biscoe was personally involved in placing Harris in a cell with Harris-Bracey, or that Biscoe was deliberately indifferent to Harris's safety, summary judgment is warranted in Biscoe's favor.

"The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.' " *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (quoting *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir.2000)). Second, "a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrong.' " *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)). "A plaintiff makes sufficient allegations of a defendant's personal involvement by

describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Id.*

Harris's Eighth Amendment claim against Biscoe appears to be premised on two separate, but related contentions. First, that Biscoe failed to protect Harris when disclosing (or causing Santana to disclose) in a misconduct report that he was an "informant," which Biscoe "knew or should have known" would prompt rumors of Harris being a "rat" and the concomitant danger. Doc. 1-4 at 9; Doc. 61 at 6; Doc. 61-8 at 9; Doc. 55-4 at 8–9. And second, that Biscoe failed to protect Harris when placing him in the cell with Harris-Bracey. Doc. 1-4 at 9, 11.

Focusing on the second contention, which was more temporally proximate to Harris's physical injury, the credible evidence of record shows that Biscoe was not among the prison staff who caused Harris to be placed in Harris-Bracey's cell on February 24, 2020. Thus, even accepting that the challenged cell placement could constitute the deprivation of a constitutional right, Harris cannot establish Biscoe's personal involvement for purposes of Section 1983 liability.

First, the incident reports generated from the assault list Corrections Officers Derr, Torres, Martin, and Rakus as the prison staff

involved in physically moving Harris into the cell. Doc. 55-3 at 11, 13, 15, 17. Second, Biscoe testified in his deposition that he was not involved in the cell assignment decision-making process, that he did not work in the restricted housing unit where Harris and Harris-Bracey were specifically housed, and that he had no general involvement in Harris's placement in a cell with Harris-Bracey. Doc. 55-8 at 13, 15, 16, 19.

In response, Harris offers only the deposition testimony of another inmate, Deon Brown, which fails to establish Biscoe as a responsible party for Harris's housing with Harris-Bracey. Namely, Brown testified:

> Q    How about Corrections Officer Biscoe?
> A    Yep. That's the big guy.
> Q    Is that the guy that put [Harris] in there with [Harris-Bracey]?
> A    He is the boss boss. As far as I know nothing happened without him knowing a hundred percent.
>
> . . .
>
> Q    So from your understanding Harris-Bracey couldn't have gone into that cell without Mr. Biscoe knowing about it?
> A    A hundred percent. A hundred percent.

Doc. 61-4 at 15.

That testimony falls short of creating a disputed issue of material fact when compared to the evidence of record showing Biscoe's lack of involvement with placing Harris in the cell with Harris-Bracey. Brown did not testify to any direct knowledge of Biscoe moving Harris, or causing others to move Harris, into the cell, offering only speculation and hearsay that Biscoe *knew* of the cell transfer. Even Harris, in his own deposition testimony, failed to aver that Biscoe was involved in Harris's placement in the cell with Harris-Bracey. Rather, Harris only recounted how he told Biscoe through a request slip that he was in generalized danger, and that Biscoe was to blame for Harris gaining a reputation as an informant. Doc. 55-4 at 8–9. Accordingly, no reasonable jury could conclude that Biscoe was involved in placing Harris in the same cell as Harris-Bracey.

By contrast, the record contains sufficient evidence to create a disputed issue of material fact concerning whether Biscoe was personally involved with disclosing Harris's status as an informant. Thus, a more thorough analysis of the charged offense is warranted on those grounds. To establish a prima facie Eighth Amendment failure to protect claim, Harris must prove that: (1) he "was incarcerated under

conditions posing a substantial risk of serious harm," (2) prison officials were "deliberately indifferent to that substantial risk to his health and safety," and (3) the officials' "deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020).

Publicly labeling a prisoner an informant, or contributing to such a label, can create a substantial and particular risk of serious harm from other inmates for purposes of a failure to protect claim. *See Moore v. Mann*, 823 F. App'x 92, 96 (3d Cir. 2020) (per curiam) (recognizing that "other circuits have held that prison officials' failure to protect an inmate labeled a 'snitch' constitutes deliberate indifference"); *Bistrian*, 696 F.3d at 371 (concluding that a prisoner's reputation as a snitch allowed one to reasonably infer that placing him with violent inmates "created a substantial risk of serious harm.").

Here, the operative misconduct report for fellow inmate Shields, authored by Santana, states, "per Lt. Biscoes written DC141 I/M Harris another involved party admitted to BII agents that I/M Shields paid him to get synthetic cannabinoids and that he instructed Ms. Edwards to send the package of K2 to the Mt. Carmel address provided by

Shields." Doc. 61-8 at 7; Doc. 55-4 at 8. Harris also produced purported letters from other inmates indicating that Harris was identified as a cooperator after being named in the misconduct report. *See* Doc. 62 at 11, 13, 14, 15 ("Ya big homies a rat"; "Yo look right someone gave me 'Dannys' misconduct & sanction report. Bro you know bool '[Harris]' a 'rat' man."; "[Harris] is no good. He str8 ↑ rat."; "I would be catious if you go [to the unit] cuz alot of people are running your name in the mud.") (errors in originals).

Moreover, Harris produced evidence showing that he filed a grievance concerning Biscoe's alleged disclosure of the "confidential" information and the resulting risk to his safety. Doc. 61-8 at 9–10. Harris further testified that he attempted to inform Biscoe through a "VIA request slip" that the disclosure endangered Harris and left him in fear for his life. Doc. 55-4 at 20–21. Taken together, these factors readily establish a disputed issue of material fact over whether Biscoe (and Santana) placed Harris at a substantial risk of serious harm during the misconduct proceedings for Shields, for purposes of the first element of the offense. *Moore*, 823 F. App'x at 96; *Bistrian*, 696 F.3d at

30

371. For those same reasons, Harris can establish Biscoe's personal involvement in this aspect of the claim.

An evaluation of the second element, however, proves more problematic for Harris. In his motion for summary judgment, Biscoe contends that because Harris did not tell any prison officials Harris-Bracey posed a danger to Harris's safety, Biscoe could not have been aware of the "specific danger presented to be deliberately indifferent." Doc. 56 at 14. In rebuttal, Harris highlights circumstantial evidence, including the generalized danger inherent in being labeled an informant in prison, and Harris-Bracey's reputation for dangerousness. Doc. 61 at 6. As the record undisputably shows that Biscoe did not know that Harris-Bracey posed a threat to Harris's safety, Harris cannot establish Biscoe's deliberate indifference, and summary judgment is warranted in his favor.[4]

"The question of [a defendant's] deliberate indifference is a subjective inquiry . . . ." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d

---

[4] Putting aside the absent administrative exhaustion barriers set forth above, this analysis applies equally to the Eighth Amendment failure to protect claim against Dunkle, Delbalso, and Matrey. Even viewing the evidence in the light most favorable to Harris, and assuming it sufficiently shows that Harris apprised these three defendants of his generalized fear for his safety, it would still fail to establish deliberate indifference.

249, 256 (3d Cir. 2010) (internal citations omitted). "[I]n determining whether a prison official has shown deliberate indifference to inmate health or safety, [a court] must look to what a prison official actually knew rather than to what a reasonable official in his or her position should have known." *Serafin v. City of Johnstown*, 53 Fed. App'x. 211, 214 (3d Cir. 2002).

"A plaintiff may demonstrate deliberate indifference by showing that the risk of harm was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past' such that the defendants 'must have known' about the risk." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). However, not only must a prison official be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but the official "must also draw the inference." *Farmer*, 511 U.S. at 837. Thus, "[t]o overcome a motion for summary judgment, a plaintiff 'must come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm.' "

32

*Betts*, 621 F.3d at 259 (quoting *Beers–Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001)).

Here, Biscoe contends that he had no actual knowledge that Harris was in danger, either generally or specifically from Harris-Bracey. During his deposition testimony, Biscoe stated that he had no knowledge of Harris informing any corrections officers that he felt he was in danger, prior to Harris-Bracey's attack. Doc. 55-8 at 13–14. Biscoe likewise professed no knowledge of Harris having a reputation for being a "rat." *Id*. at 8. Biscoe also testified that he recognized Harris-Bracey's name, but had no knowledge or recollection of him being dangerous or attacking people. *Id*. at 7–8.

In response, Harris avers that he notified SCI Mahanoy personnel, including Biscoe, that he was in danger. During his deposition, Harris testified that he "told everybody there basically that I fear for my life and being in danger due to these reports" about him being an informant. Doc. 55-4 at 20. He also testified that he "wrote [Biscoe] VIA request slip as well," and professed to have a copy. *Id*. at 21. Although Harris does not offer that request slip in evidence, or aver a basis to believe it was received and reviewed by Biscoe, his testimony

33

gives rise to a factual dispute over whether Biscoe was on notice that Harris believed he was in danger.

Viewing that evidence in the light most favorable to Harris, the inquiry then turns to whether a generalized knowledge that Harris might be in danger suffices to establish a prima facie case of deliberate indifference. Critically, Harris admitted in his deposition that he never told any prison officials that he was in danger from Harris-Bracey specifically, and did not expect to be attacked by Harris-Bracey. *Id.* at 20, 28. Indeed, Harris and Harris-Bracey were cellmates prior to the assault, during which time they reportedly did not have any issues with one another. *Id.* at 18; Doc. 55-6 at 10.

Thus, even if Harris conveyed his generalized safety concerns to Biscoe, no reasonable jury could find him deliberately indifferent to any threat posed specifically by Harris-Bracey to Harris. "It is true that the requisite mindset may be proved by circumstantial evidence, such as where a plaintiff demonstrates that a substantial risk was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past.'" *Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014) (quoting *Farmer's*, 511 U.S. at 842). Not so here, however,

where Harris offers no evidence showing a historically documented risk to him from Harris-Bracey, or specific notice to Biscoe of Harris-Bracey's threat, and even offers testimony to the contrary. *Id.* (finding no "indication in the record that [inmate] told [corrections officer] of any specific incident or cause of tension between the cellmates from which a greater inference of risk could be drawn."); *Bistrian*, 696 F.3d at 369–71 (finding a reasonable inference of deliberate indifference where the plaintiff-inmate "repeatedly advised" officials of the threat posed to him by specific gang members who threatened him for being an informant).

Indeed, to conclude otherwise would deem Biscoe deliberately indifferent to a threat from Harris-Bracey to which Harris himself professed ignorance during his deposition testimony. *See* Doc. 55-4 at 28 ("I never believed I was in danger from him at all."); *see also Crowder v. Wetzel*, 2022 WL 4647369, at *7 (M.D. Pa. 2022) (granting summary judgment where plaintiff inmate "did not inform anyone that he was in imminent danger of being attacked by his assailant prior to the incident—indeed, it is undisputed that [inmate] himself did not believe he was in any danger.").

Harris seeks to leverage evidence—primarily deposition testimony from prison officials and other inmates—showing that Harris-Bracey was an unpredictable inmate with a relatively violent history. *See* Doc. 61-7 at 12; Doc. 61-4 at 7–8; Doc. 61-5 at 7–8. However, "[t]he risk that an inmate with some history of violence might attack another inmate for an unknown reason, . . . is too speculative to give rise to an Eighth Amendment claim." *Blackstone*, 568 F. App'x at 84; *see also Bistrian*, 696 F.3d at 371 (same); *Straker v. Valencik*, 2021 WL 1134591, at *8 (M.D. Pa. 2021) (granting summary judgment where inmate plaintiff "failed to allege that [prison officer] knew of a serious risk of harm by the alleged assailant and that he disregarded that risk. . . . While Plaintiff alleges that Defendant [] may have been aware of the assailant's violence, there is no indication of that [Defendant] was aware of any threats of physical harm or violence toward Plaintiff that were disregarded. As such, Plaintiff's allegations are too speculative to state a deliberate indifference claim . . . .").

Accordingly, as the undisputed facts show that Biscoe was not aware of any specific threat posed to Harris by Harris-Bracey, no

reasonably jury would find Biscoe deliberately indifferent, and summary judgment is warranted.

## 2. *Failure to protect claim against Santana*

Santana requests summary judgment on the grounds that her alleged failure to act on a grievance filed by Harris is not cognizable under Section 1983. Doc. 56 at 11–12. In the alternative, Santana, like Biscoe, avers that the record demonstrates Harris's inability to establish a prima facie failure to protect claim. *Id.* at 12–16. In rebuttal, Harris simply cites to his grievance and states that "he told Defendant Santana that he was in danger, but Santana failed to act." Doc. 61 at 13. As nothing in the record supports that averment, and Harris's claim is solely, and impermissibly premised on Santana's role in the grievance process, summary judgment is warranted in his favor.

Again, "[t]he first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Chavarriaga*, 806 F.3d at 222 (quoting *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir.2000)). Importantly, "an inmate has no constitutional right to a grievance

procedure," and thus, the denial of a grievance does "not infringe upon [the] constitutional right to petition the government for redress." *Caldwell*, 324 F. App'x at 189.

Here, Harris's assertions and supporting evidence fall short of demonstrating the necessary deprivation of a constitutional right required under Section 1983. In his Complaint, Harris alleged that he "filed a grievance regarding his egregious treatment[,]" that Santana reviewed it, but that "nothing was done." Doc. 1-4 at ¶25. He offers no evidence in support of that claim against Santana, and in his deposition, Harris only references Santana's authorship of the misconduct report identifying Harris as an informant. Doc. 55-4 at 11, 16. Accordingly, to the extent Harris's claim against Santana is premised on her evaluation or inaction on a grievance, it cannot proceed as a matter of law. *Caldwell*, 324 F. App'x at 189.

Even if Harris's claim is construed more broadly to encompass Santana's involvement in the misconduct hearing that disclosed Harris's status as an informant, it suffers from vulnerabilities identical to those in the claim against Biscoe. Namely, Harris offers no evidence showing that Santana was aware that Harris-Bracey presented a threat

to Harris's safety. As with Biscoe, the testimony germane to Santana lies in Harris's own admissions that he never told any prison officials that he was in danger from Harris-Bracey specifically, did not expect to be attacked by Harris-Bracey, and did not view Harris-Bracey as presenting a danger. Doc. 55-4 at 20, 28. Unlike Biscoe, Harris does not offer any testimony that he specifically advised Santana of a perceived threat, stating at most that he "told everybody" he felt in danger. *Id.* at 20. Absent greater specificity, no reasonably jury could conclude that Santana was deliberately indifferent to Harris's safety.

## IV. <u>Recommendation</u>

For the reasons set forth above, it is **RECOMMENDED** that:

1.  The Defendants' motion for summary judgment (Doc. 54) be **GRANTED**, and all remaining claims and defendants be **DISMISSED WITH PREJUDICE**; and

2.  The Clerk's Office be **DIRECTED** to **TERMINATE** Banta, Biscoe, Delbalso, Dunkle, Mahally, Mason, Matrey, Rivello, Santana, Stetler, and White as Defendants and **CLOSE** this case.

The parties are further placed on notice that pursuant to Local

Rule 72.3:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report addressing a motion or
> matter described in 28 U.S.C. § 636 (b)(1)(B) or making a
> recommendation for the disposition of a prisoner case or a
> habeas corpus petition within fourteen (14) days after being
> served with a copy thereof. Such party shall file with the clerk
> of court, and serve on the magistrate judge and all parties,
> written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report
> to which objection is made and the basis for such objections.
> The briefing requirements set forth in Local Rule 72.2 shall
> apply. A judge shall make a de novo determination of those
> portions of the report or specified proposed findings or
> recommendations to which objection is made and may accept,
> reject, or modify, in whole or in part, the findings or
> recommendations made by the magistrate judge. The judge,
> however, need conduct a new hearing only in his or her
> discretion or where required by law, and may consider the
> record developed before the magistrate judge, making his or
> her own determination on the basis of that record. The judge
> may also receive further evidence, recall witnesses or
> recommit the matter to the magistrate judge with
> instructions.

The failure to file timely objections to the foregoing Report and

Recommendation may constitute a waiver of any appellate rights.


Date: September 15, 2025          *s/ Phillip J. Caraballo*
                                  Phillip J. Caraballo
                                  United States Magistrate Judge